(110 App. Div. 510)

## AUSTIN v. BARKER.

(Supreme Court, Appellate Division, Fourth Department.   January 3, 1906.)

SEDUCTION—SUFFICIENCY OF EVIDENCE—HYPNOTISM.

Evidence in an action for seduction, in which the female alone testi-
fied to the intercourse, and stated that she knew nothing of it till after-
wards hypnotized by a third person, *held* insufficient to sustain a ver-
dict for plaintiff.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Seduction, § 84.]

Appeal from Trial Term, Oneida County.

Action by David Austin against Frank Barker.   From a judgment
for plaintiff, and from an order denying a motion on the minutes for a
new trial, defendant appeals.   Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and NASH, JJ.

L. M. Martin, for appellant.

D. F. Searle, for respondent.

NASH, J. This case comes here a second time on appeal from a recovery by the plaintiff. The case is briefly outlined in the syllabus of the former appeal (90 App. Div. 351, 85 N. Y. Supp. 465) as follows:

"Upon the trial of an action for the seduction of the plaintiff's daughter, who was delivered of a fully developed child in August, 1901, the only evidence tending to show that the defendant had had improper relations with the plaintiff's daughter was given by the daughter herself. She testified that the improper relations commenced October 30, 1900, and continued until January 1, 1901; that all the improper acts occurred in her father's house in a room which was separated by an ordinary door from a room in which her mother or father usually sat. In speaking of the first of these occasions she testified that the defendant made an improper proposal to her which she indignantly rejected; that they then sat and talked a few minutes, after which the defendant forcibly took her and placed her upon a couch and accomplished his purpose; that she resisted and struggled, but did nothing to attract the attention of her parents, one or both of whom were in the adjoining room. The defendant denied his guilt, and gave testimony tending to show that he was at other places on some of the occasions when the plaintiff claimed that he was with his daughter. The defendant also testified that, although he lived near the plaintiff, no suggestion that he was responsible for the condition of plaintiff's daughter was made until many weeks after the birth of the child."

Referring to the circumstances of the case, as thus stated, the court said (page 354 of 90 App. Div., page 466 of 85 N. Y. Supp.):

"While some of the circumstances in the case thus briefly outlined are somewhat unnatural, they perhaps are not so extraordinary that we should feel justified in refusing to accept and abide by the verdict of the jury upon them, if there were nothing else to be considered. Other evidence, however, to which we shall now refer, was given upon the trial of so unusual a character that we feel unwilling to allow the verdict to be based upon it. After the daughter had been quite extensively examined both on behalf of the plaintiff who called her and by counsel for the defendant, and had left the stand, she was, upon the urgent request of the defendant's counsel, predicated upon new information received by him, recalled and examined. She then, in effect, testified that she was entirely unconscious of defendant's various acts of relation with her at the various times when the same were occurring; that she did not know and was unaware that they had at all occurred during the entire term of her pregnancy and down to a period of several weeks after the birth of her child; that upon the first occasion of improper conduct she simply realized and understood what was taking place up to the time the defendant placed her upon the couch; that in October, 1901, she was visited by the plaintiff's attorney, and as a result of what then occurred her mind was so influenced and awakened that it grasped a recollection or consciousness of defendant's acts with her in the fall of 1900, so that from that time on down to and including the trial she had a present knowledge and recollection that the defendant had committed with her acts resulting in her seduction and childbirth."

On this trial, as upon the former, the daughter testified to the several acts of intercourse had with the defendant, as if they were fresh in her recollection, recalled without any indication that there had been at any time any lapse of memory. She testified that on the first occasion, October 30, 1900, defendant called about 8 o'clock in the evening and remained until about half past 10. After visiting for some time he remarked that he was tired, and laid down upon the couch and slept for

a few minutes, and then he "came and sat down beside me, rested his head on my shoulder, and suggested that we have sexual intercourse. I objected. After that he took hold of me. After a slight struggle, he placed me on the couch and we had sexual intercourse. My father and mother sat in the next room. The door was unlocked. The light was burning. Perhaps I didn't try to arrest the attention of my father and mother. I had never had sexual intercourse with any one before that." She proceeded in her testimony in chief to give the several dates of other acts of illicit intercourse at her father's house under similar sur-roundings, during the months of November, December, and January following, giving the precise dates, November 4th, 8th, 11th, 16th, 20th, December 1st and 22d, and about the middle of January. As upon the first trial, it was not until her cross-examination that the extraordinary facts she testified to were brought out. She endeavored to break the force and effect of her former testimony, attributing to hypnotic influences alone the phenomenal return of recollection, by stating on the last trial that she did have some recollection of the occasions that defendant had intercourse with her before she was hypnotized by her father's counsel, Mr. Searle. She says:

"I did at one time remember, before Searle hypnotized me, of the occasions when Barker had intercourse with me. It was immediately after my baby was born. Q. Prior to the time your baby was born you never knew and never had any consciousness that Barker had connection with you, did you? A. No, sir; not to be sure. Q. And that was momentarily? A. Yes. Q. Now, all the time that you have described and the events which you have narrated with reference to having connection with Barker were unknown to you, except you think there was a flash of a thought that he had had connection with you just after the baby was born? A. Yes. Q. And you didn't know another thing about it, didn't have any recollection that any such thing had occurred, any consciousness that it had ever occurred until after Searle hypnotized you? A. Not to be sure of it; no, sir."

Upon further examination she fully assented to her former testimony, and by answers to direct questions made more prominent the fact that her recollection as to the several occurrences of alleged intercourse had with the defendant is wholly based upon hypnotic influence. To defendant's counsel:

"This question was asked me on the former trial, speaking of the fall of 1901, at my house: 'Q. How long were you hypnotized? A. I don't know. Q. What did he do to hypnotize you—I mean Mr. Searle? A. Why, he told me to sleep.' I swore to that. I don't know whether it was true or not. Q. Have you doubt about its being true? A. Doubt about what? Q. Doubt about your evidence being true on the former trial that I have just read to you? A. Why, in substance, yes, some of it. I don't know that I was hypnotized by Mr. Searle in the fall of 1901, but I think so. He told me to sleep and I slept. I didn't go to sleep right off, not for a few minutes. Mr. Searle hypnotized me at my house twice before the suit was brought. The second time was some time the latter part of September. I did not tell Mr. Searle before he hypnotized me on what days Barker had had intercourse with me. He put me to sleep the last time about six weeks, perhaps, before the lawsuit was brought. On the first occasion that Searle put me to sleep, he smoothed my hair and told me to go to sleep. I don't remember that he did anything else. Perhaps I swore on the previous trial that I didn't know that Barker had sexual intercourse with me on any of the occasions which I referred to until after I had been hypnotized by Searle. Q. Now, was this question asked you on the other trial: 'Q. Now, when was it that you first recalled and remembered that the defendant had illicit intercourse with you on the 4th of November, 1900? Was

that when Searle first hypnotized you?  A. After.'  Was that question asked you, and was that answer given by you?  A. Yes, sir; I think it was.  Q. Was that true?  A. Yes."

The same question was asked and the same answer given as to the dates of November 8th, 16th, and 20th, and December 24th:

"'Q. Now, as a matter of fact, until Searle hypnotized you, you didn't have any memory at all on the subject, did you?  A. Yes, sir.'  Is that question and answer right?  A. It was at that time; yes.  Q. Is it now?  A. I would say now that I didn't have a clear memory before that.  Q. You want to change your evidence in that respect?  A. Yes.  Q. Was this question asked you and answer given:  'Q. You never remembered in the world until Searle hypnotized you that the defendant had ever had illicit intercourse with you whatever, did you?  A. No, sir.'  Was that question asked, and did you answer 'No, sir,' to that question?  A. I did; yes.  Q. Was it true, or untrue?  A. Why, I did have memory.  Q. Well, you said you didn't until after Searle hypnotized you, didn't you?  A. Perhaps I did; yes.  Q. Was your answer true then, or was it false then?  A. It must have been false.  Q. False in what particular?  A. Because I did remember it shortly after my child was born.  Q. Isn't it true that you didn't remember the number of times a night that Barker had connection with you until after Searle hypnotized you?  A. Yes, that is true.  Q. That is true.  And it was after he hypnotized you and you came out of the hypnotic state that you began to recall, wasn't it?  A. Yes.  I didn't recall these things clearly until after Mr. Searle hypnotized me.  I didn't recall anything that occurred during the time Barker was at my house on November 4, 1900, until after the child was born.  I didn't recall these things except in an uncertain way until after Mr. Searle hypnotized me.  I didn't recall anything or remember anything that occurred on the night of the 8th of November, 1900, while Barker was at my house, until after the child was born, and I only recollected them in a hazy way, and didn't recall them perfectly until late in the fall after Mr. Searle hypnotized me.  By the Court:  Q. Now, let me see.  Do I understand you to say that during your entire pregnancy, down to a time after the birth of your child, you had no knowledge or memory whatever as to who was the father of the child?  A. No, sir.  Q. You had none?  A. No, sir.  Q. At some time you noticed that your menses stopped?  A. Yes, sir.  Q. Then I suppose you noticed some change in your form?  Your abdomen grew?  A. Yes, sir.  Q. You noticed that you had nausea in the morning?  A. Yes.  Q. And I suppose you had had experience and observation enough to know that those were indications of pregnancy?  A. Yes.  Q. And probably later on you noticed the motions of the foetus?  A. Yes, sir.  Q. And all of that time you were wholly unconscious of the fact that you had ever had connection with any man?  A. Yes, sir.  Q. How did you undertake to account for your situation?  A. I didn't know how to account for it.  Q. You didn't know?  You couldn't surmise it?  A. No, sir."

She also claimed that she was hypnotized by the defendant:

"By Defendant's Counsel:  Q. Now, if I recall your testimony, on the other trial you said that Barker hypnotized you during this struggle.  Is that right?  A. Yes.  Q. Well, while you were making the struggle for your virtue which you have described, Barker hypnotized you by pulling the hairpins out of your hair.  Did you swear to that?  A. No, sir.  Q. What did you swear in that respect?  A. That he smoothed my hair; that he manipulated my hair.  He took my hair down and smoothed it some.  After that was when the struggle occurred.  He took hold of my shoulders, holding my arms down, and finally placed me upon the couch; I struggling all the while.  Perhaps I testified on the other trial that what he did and the only thing he did was to pull my hairpins out of my hair, except struggle and fight with me.  That wasn't true, and I haven't been instructed that I couldn't be hypnotized in that way.  He was smoothing my hair just a few minutes.  I don't know how many.  I was sitting in a chair.  He did not tell me to sleep.  I was in a state of repose at the time he stroked my hair.  I was not asleep when he grabbed me.  I fought him, and struggled.  He threw me on the lounge, and during this struggle my memory

and consciousness, as far as my memory was concerned, went out. My memory went out before the sexual intercourse. On the other trial I gave a detailed description of the occurrences on each of these occasions when sexual intercourse took place. The first occasion was not the only time on which I claimed he hypnotized me. By the Court: Q. How soon after the first occasion, the 30th of October, was it that it dropped out of your memory? A. The next morning, or that night some time. Q. That is, while the act was being done, you were conscious of it? A. Yes, sir. Q. And knew it until the next morning? A. Until in the night after I slept. Q. And in the morning you knew nothing about it? A. No, sir."

Except as to the acts of copulation there was no loss of memory:

"By the Court: Q. So that the only aberration of memory that you suffered was regarding the acts of sexual intercourse that you had with him? A. Yes. Q. And you remember all other things? A. Yes."

Again, after some special instances to which her attention was directed by questions of plaintiff's counsel:

"By the Court: Q. As I understand you in answer to my question, you said the lapse of memory was wholly with reference to the sexual intercourse? A. Yes. Q. From the time of pregnancy down until the birth of the child? A. Yes. Q. And that all other things passed along in the usual manner; that is, you were about the house doing the housework, and attending to your ordinary duties in the ordinary manner, knowing what you were doing and remembering it from day to day? A. Yes, sir. Q. Entirely conscious of that? A. Yes, sir."

These very voluminous abstracts from the testimony of the daughter of the plaintiff, the only witness by whom her alleged seduction by the defendant was sought to be shown, do not, perhaps, give the most comprehensive idea of this very remarkable case. There was no attempt to explain how by hypnotic influence the witness could be rendered unconscious of the various alleged acts of intercourse had with the defendant, or made to forget in the morning the occurrences of the night before, or how, if there had been the loss of memory as testified to, it could by means of hypnotism be restored. Hypnotism is defined to be a name applied to a condition, artificially produced, in which the person hypnotized, apparently asleep, acts in obedience to the will of the operator; and we are told by the authorities upon the science that upon awakening there may be a vivid recollection of all that happened during the apparent sleep. If such were the case here, we should have some evidence to support the claim made by the witness that her memory was restored by the operation. It was the duty of the plaintiff to have furnished the court, by the testimony of the operator or of those present, presumably the plaintiff and members of his family, with some evidences, if there were any observable, of information imparted either by or to the daughter upon her awakening. She does not know, except as she has been told, how she was informed of the occurrences to which she testified. She does not even know that she was hypnotized. She attributes the return of consciousness of that of which she was before unconscious to hypnotic influence. In effect her testimony as to events of which she was before unconscious is hearsay; knowledge not of her own, but acquired. On the former appeal, it was held that:

"If the plaintiff relied upon some science and theory not generally known or understood, he should have introduced competent evidence tending to sustain the probability or possibility of the existence of what he claimed."

Presumably to give the required explanation, the plaintiff called two physicians, who, in answer to a hypothetical question in which the principal features of the phenomena experienced by the witness were assumed to be true, stated that it was due to her pregnancy:

"To Defendant's Counsel: I should expect the physical changes to occur that would result in the loss of memory about the third or fourth month after intercourse between a man and woman. Q. You would not expect that there would be loss of memory from pregnancy before the man and woman got actually together, but while they were struggling to determine whether or not something should be done? A. No. Q. And if that was the fact you would not attribute it to pregnancy? A. No. Q. Now, in case they did actually come together—and that was the first time—do you think, from anything that you have ever read, that you could say that the girl would forget it the next morning when she woke up, just the night's sleep intervening, because of the physical changes induced by that copulation? A. No, sir. By the Court: Q. Well, is it your opinion, doctor, that the act of copulation, particularly for the first time, would be pretty indelibly impressed upon her memory? A. Yes. Q. And would stay by her, certainly, as long as the ordinary events that were transpiring in her ordinary life and about her? A. Yes, sir. Q. Is that right? A. Yes, sir."

It is needless to observe that the physicians in no manner explain the extraordinary lapses of memory testified to by the witness. Their testimony accords with the ordinary experience that such varied mental aberrations do not and cannot occur. The plaintiff has wholly failed to meet the demand made by this court on the former appeal for evidence tending to sustain the probability or possibility of the existence of what is claimed in behalf of the plaintiff.

The question is not whether the verdict is against the weight of evidence. It is whether there is any evidence of sufficient weight to support the verdict. It was held by this court upon the former appeal that as the case then stood the evidence was not sufficient to sustain a verdict in favor of the plaintiff. The evidence of the plaintiff, in view of the attempted explanation by medical evidence of the unusual mental aberrations, unaccounted for, and the absence of the explanatory evidence suggested by this court on the former appeal, is of weaker probative force than before.

In the McDonald Case, 167 N. Y. 66, 60 N. E. 282, there was, as stated in the opinion, a direct and somewhat severe conflict in the evidence. The plaintiff's evidence established a case which, undisputed, was regarded sufficient to warrant a verdict in her favor. The court below having directed a verdict for the defendant because the plaintiff's case had been so far overcome that a verdict in her favor would have been set aside as against the weight of evidence, it was held erroneous; but it was said that if the evidence is sufficient, or if that which has been introduced is conclusively answered, so that as a matter of law no question of credibility or issue of fact remains, then the question being one of law, it is the duty of the court to determine it (page 70 of 167 N. Y., page 283 of 60 N. E.). In Bagley v. Bowe, 105 N. Y. 171, 11 N. E. 386, 59 Am. Rep. 488, it is held that to justify the court in directing a verdict in any case upon the facts, the evidence must be undisputed or so certain and convincing that no reasonable mind could come to any but one conclusion.

The evidence here must be deemed so unreasonable, so contrary to all rational experience, that a verdict based upon it ought not to be

permitted to stand. The judgment should be reversed, and a new trial granted, upon the ground that the verdict is entirely unsupported by the evidence.

Judgment and order reversed, and new trial ordered, with costs to the appellant to abide the event upon questions of law only, and facts having been examined and no error found therein. All concur. SPRING and HISCOCK, JJ., vote for reversal, on the ground that the verdict is against the weight of the evidence.